**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JEANETTE L. MIKEL,** | ) |
| | ) |
|         **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil No.   14-cv-991-CJP**[1] |
| | ) |
| **COMMISSIONER of SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
|         **Defendant.** | ) |

**<u>MEMORANDUM and ORDER</u>**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jeanette L. Mikel (a/k/a Jeanette L. Rice) is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[2]

**<u>Procedural History</u>**

Ms. Mikel applied for benefits in July 2011, alleging disability beginning on January 1, 2009.  (Tr. 15).  After holding a hearing, ALJ William L. Hafer denied the application for benefits in a decision dated July 3, 2013.  (Tr. 15-29). Plaintiff's request for review was denied by the Appeals Council, and the decision of

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 10.

[2] At various points in the record, plaintiff is referred to as Jeanette Mikel, Jeanette Rice, and Jeanette Mikel-Rice.  She filed her lawsuit under the name Jeanette L. Mikel.  The Court will therefore use that name.

the ALJ became the final agency decision.   (Tr.1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following issues:

1.    The ALJ did not meet his burden at step 5 because the jobs testified to by the Vocational Expert (VE) exceeded plaintiff residual functional capacity (RFC).

2.    The RFC findings were not supported by substantial evidence because the ALJ rejected all of the medical opinions in evidence and relied on his own medical conclusions.

3.    The credibility analysis was erroneous.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

A "physical or mental impairment" is an impairment resulting from

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For purposes of this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work experience.   *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Mikel was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**The Decision of the ALJ**

ALJ Hafer followed the five-step analytical framework described above.   He determined that Ms. Mikel had not been engaged in substantial gainful activity since the alleged onset date, and that she had severe impairments of degenerative disc disease of the lumbar, thoracic and cervical spine; COPD; obesity; early spurring and arthritis of the left knee; and depression.   He determined that plaintiff's impairments do not meet or equal a listed impairment

The ALJ found that plaintiff had the residual functional capacity (RFC) to do light work with physical and mental limitations.   Her mental limitations restricted her to performing simple, repetitive tasks, involving one or two steps, in a work setting with a pace less than that of a typical assembly line.

Based on evidence from a vocational expert (VE), the ALJ found that plaintiff does not have the capacity to perform her past relevant work.   However, she was not disabled because she could do other jobs which exist in the national economy, such as survey clerk, parking lot attendant, and telephone quote clerk.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms**

Plaintiff was born in 1964, and was almost 45 years old when she allegedly became disabled.  (Tr. 160).  She was 5'3" tall and weighed 256 pounds.  She said she was unable to work because of COPD, bipolar disorder, bulging disc and

bone spurs in her spine, depression and anxiety/panic disorder.   (Tr. 164).

Ms. Mikel had a GED.   She was trained as a CNA and worked as a CNA in nursing homes and hospitals from 1991 to 2009.   (Tr. 165).

In a Disability Report, plaintiff said she was unable to work because of severe back pain, bipolar highs and lows, COPD and trouble breathing.   She said she was unable to lift more than 5 pounds and needed back surgery.   She stated that she did not do much around the house except for washing dishes, wiping the counters, and cooking simple things like soup, sandwiches and cereal.   Her husband had to help her with shopping because she could not lift anything.   She could walk only about half a block and could not reach higher than her waistline.   (Tr. 188-195).

**2.      Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing on March 25, 2013.   (Tr. 42).

Ms. Mikel testified that her worst pain was in her low back.   She took Tramadol and sometimes Tylenol 3 for pain.   She was able to sit for an hour and stand in one place for two hours.   She could walk for half a block.   She had shortness of breath. She used an inhaler.   (Tr. 47-49).

Plaintiff also had pain up and down her spine and in her neck.   Her knees hurt.   (Tr. 59).   She had to sit with her feet up a couple of times a week to relieve knee pain.   (Tr. 64).

Plaintiff testified that she cried three or four times a week.   Her primary care physician prescribed medication for her depression.   She had panic attacks three times a week.   (Tr. 51-53).

6

A vocational expert (VE) also testified.  The ALJ asked him to assume a person who was able to do work at the light exertional level, with only occasional stooping, kneeling, crouching, crawling and climbing stairs; no climbing of ladders, ropes or scaffolding; no work at unprotected heights or around dangerous machinery; and only occasional reaching overhead with the dominant upper extremity.  She was also limited to simple, repetitive tasks, "generally involving one, two, or perhaps three-step instructions in a work setting with no rigid deadlines that would typically be the case in high production type work such as a typical assembly-line."  (Tr. 67).

The VE testified that plaintiff's past work would be precluded.   She would be able to do other jobs such as survey worker clerk, parking lot attendant, and telephone quotation clerk.   (Tr. 68-69).   The VE also stated that her testimony did not conflict with information in the DOT.   (Tr. 70).

**3.    Medical Records**

Ms. Mikel received most of her medical care from her primary care physician, Dr. Cristopher Reyes.

In April 2008, Dr. Reyes noted that plaintiff was seeing a pain management specialist and was going to physical therapy for a TENS unit.   Physical examination showed tenderness at L5-S1.   (Tr. 551).

The records of the pain management specialist indicate that plaintiff underwent lumbar facet block and medial branch nerve block injections in April and June 2008.   In July 2008, the specialist recommended a facet neurotomy at L4-5 and L5-S1.   (Tr. 556-564).

7

In September 2008, Dr. Reyes noted a normal work physical.   (Tr. 548).   In November 2008, his assessment was severe low back pain and lumbar degenerative disease.   He prescribed Neurontin for pain.   He also prescribed Xanax, and noted that she had "chronic panic/anxiety attacks due to loss of son."   (Tr. 546).

Plaintiff's alleged date of onset is January 1, 2009.

Ms. Mikel was seen by a physician's assistant in Dr. Reyes' office in April 2009.   Plaintiff had been beaten up by her live-in boyfriend.   Her boyfriend "stole all her drugs" and she therefore asked that they be refilled.   (Tr. 542-543).

In May 2009, Dr. Reyes noted anxiety and prescribed Paroxetine (Paxel) rather than Xanax.   (Tr. 539-540).   In October 2009, she was "very edgy" and Dr. Reyes thought she was manic.   He declined to prescribe Vicodin for her back pain for fear that she might become addicted.   His assessment was anxiety and bipolar disorder.   He prescribed Zyprexa for those conditions and prescribed Piroxicam (Feldene) for back pain.   (Tr. 533).   In January 2010, Dr. Reyes noted depression and anxiety secondary to marital discord.   He recommended that she increase her dosage of Seroquel and attend counseling.   (Tr. 527-528).

Plaintiff complained of low back pain radiating to her legs in March 2010. Dr. Reyes was "hesitant to give her a lot of strong pain medication."   He prescribed Desipramine.   (Tr. 524).   In June 2010, she complained of low back pain radiating into her right leg.   On exam, she had tenderness of L5 and S1.   Straight leg raising was positive on the right.   Dr. Reyes recommended that she have an MRI.   It was noted that she would have to set up a payment plan to have that study done.   (Tr. 518-519).   In July 2010, Dr. Reyes noted that the MRI showed bulging

discs and no significant herniation.   A pulmonary function test showed no emphysema.   (Tr. 516).   The next month, plaintiff told Dr. Reyes she was going to apply for disability.   (Tr. 513-514).

Plaintiff's weight was up to 260 pounds in May 2011.   She told Dr. Reyes that she was unable to tolerate Zyprexa.   He prescribed Risperdal for her anxiety and bipolar disorder.   (Tr. 380-381).   In June 2011, she complained of knee pain after a fall.   X-rays showed no severe arthritic changes of the knees.   (Tr. 379-380).

In July 2011, Ms. Mikel again complained of low back pain radiating into her leg.   On exam, she had significant spasms in her back.   She was walking with a limp and had tenderness radiating into the posterior thigh area.   Dr. Reyes prescribed Ultram.   (Tr. 377).   Dr. Reyes saw her about 2 weeks later.   She still had back pain radiating into the right leg.   Straight leg raising was positive.   He started her on Lyrica.   (Tr. 375).   Plaintiff called the office in September 2011 and reported that Tramadol and Vicodin no longer helped her back and she needed something different and stronger.   Dr. Reyes prescribed Lyrica and Lidoderm patches.   (Tr. 446).   On September 28, 2011, Dr. Reyes prescribed an MRI of the cervical spine because of the "chronicity" of her pain.   Also, she was unable to tolerate Haldol, so he changed her bipolar medication to Thorazine and Cogentin.[4]

A cervical MRI was done on October 7, 2011.   This study showed straightening of the cervical lordosis, diffuse posterior bulging of the C5-6 disc with moderate sized disc protrusion causing at least mild impingement of the spinal

---

[4] Cogentin is "used to control tremors and stiffness of the muscles due to certain antipsychotic medicines (e.g., phenothiazines)."   http://www.drugs.com/cdi/cogentin.html, visited on November 13, 2015.

cord, no other evidence of disc herniation and no evidence of significant central spinal canal stenosis.   (Tr. 447).

On October 31, 2011, Dr. Reyes noted that Ms. Mikel had been having problems with pain in her neck.   He stated that he would refer her to a neurosurgeon when she got on Medicaid.   He decreased her dosage of Neurontin because she was experiencing unsteadiness and poor memory.   (Tr. 442).

Plaintiff saw Dr. Reyes on November 21, 2011, for a "disability physical." Dr. Reyes wrote that Ms. Mikel had "a history of disc herniation of the neck and low back."   She also had "advanced chronic obstructive pulmonary disease."   He stated that he was "just going to fill out her disability papers with the best of my ability depending upon her response to the questionnaire."   (Tr. 440).

In January 2012, Dr. Reyes asked plaintiff to sign a "pain management contract with regards to her chronic use of pain pills."   He noted that she had "marked disc problem" and that she had "significant deformity" of her thoracic spine.   He recommended a thoracic spine MRI.   (Tr. 491).   The MRI showed a bulging disc at T7-8.   She signed a drug screening contract.   A drug screen was positive for marijuana.   Dr. Reyes indicated that he would not give her any narcotics.   (Tr. 490).

Dr. Reyes noted that plaintiff had a "documented history of neuropathy upper and lower" in May 2012.   She complained of numbness in her left arm.   He prescribed Lyrica.   (Tr. 487).

In September 2012, Dr. Reyes saw plaintiff for worsening symptoms of depression.   Her symptoms included anhedonia, altered sleep habits and crying

spells.   She was taking a number of medications, including Paxil, Neurontin, Tramadol, Ambien and Trazodone.   She was instructed to increase her dosage of Trazodone.   (Tr. 566).

The last record from Dr. Reyes is dated January 18, 2013.   Ms. Mikel presented with low back pain, and she needed a refill of her prescription for Lyrica. On examination, she had lumbar and sacral paraspinal muscle pain.   (Tr. 569-570).

### 4.   Dr. Reyes' Opinion

On November 21, 2011, Dr. Reyes completed an agency form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."   He indicated that Ms. Mikel could occasionally lift up to 10 pounds, could sit for 20 minutes, and could stand and walk for 30 minutes at a time.   She could sit and stand/walk for a total of 2 hours a day.   She could use her upper extremities for reaching, handling, feeling and push/pull only occasionally, meaning for up to 1/3 of a day.   She would likely miss 4 days of work a month due to her impairments or treatment.   (Tr. 448-454).

### 5.   Consultative Examinations

Dr. Adrian Feinerman performed a physical examination on August 25, 2011.   He found that plaintiff had no anatomic deformity of the cervical, thoracic or lumbar spine.   The range of motion of the lumbar spine was decreased. Straight leg raising was negative.   She was able to walk for 50 feet and ambulation was normal.   Muscle strength was full throughout and she had no spasm or atrophy.   Fine and gross manipulations were normal.   Grip strength was strong

and equal.   Dr. Feinerman concluded that she was able to sit, stand and walk normally, and that she was able to lift, carry and handle objects without difficulty. (Tr. 397-406).

Dollean York-Anderson, Ph.D., performed a psychological exam on August 11, 2011.   She concluded that plaintiff's concentration and memory were good, her judgment was fair and thought processes were intact.    She diagnosed depressive disorder NOS, and assessed a GAF of 70.    (Tr. 392-394).

**6.     RFC Assessments**

A state agency consultant assessed plaintiff's physical RFC in September 2011, based on a review of the medical records.   He indicated that plaintiff was able to do work at the medium exertional level (occasional lifting of 50 pounds, frequent lifting of 25 pounds), with some physical limitations.    (Tr. 429-436).

Another state agency consultant assessed plaintiff's mental RFC.    He concluded that plaintiff had moderate limitations in ability to maintain attention and concentration for extended periods.    He noted that she could have difficulty with complex instructions, but she "has the capacity to understand and complete simple 1-2 step tasks."    (Tr. 421-423).

<u>Analysis</u>

Plaintiff first argues that the jobs identified by the VE exceed her RFC because they require an ability to perform more than simple, one or two step tasks.

The Court first notes that there was a discrepancy between the hypothetical question and the ultimate RFC findings.   At the hearing, the ALJ asked the VE to assume a person who was "limited to performing simple, repetitive tasks, generally

involving one, two, or perhaps three-step instructions in a work setting with no rigid deadlines. . . ."   (Tr. 67).   However, in his RFC findings, the ALJ limited plaintiff to "performing simple, repetitive tasks, generally involving one or two steps. . . . " (Tr. 20).   This discrepancy was not mentioned in either party's brief.

The *DOT* specifies a "reasoning level" for each job.   A limitation to simple, repetitive, one or two step tasks corresponds to Reasoning Level 1:

> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

*Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702.

All three of the jobs identified by the VE require a Reasoning Level greater than1.

The first job identified by the VE was "survey worker clerk."   The VE gave an incorrect DOT number for this job, and there is no job entitled "survey worker clerk" in the DOT.   Defendant asserts that there is a job entitled "survey worker," DOT 205.367-054.   This number is only one digit off from the number given by the VE, and it is, apparently, the job to which the VE was referring.

The job description in the DOT for a survey worker, DOT 205.367-054, is as follows:

> Interviews people and compiles statistical information on topics, such as public issues or consumer buying habits: Contacts people at home or place of business, or approaches persons at random on street, or contacts them by telephone, following specified sampling procedures. Asks questions following specified outline on questionnaire and records answers. Reviews, classifies, and sorts questionnaires following specified procedures and criteria. May participate in federal, state, or local population survey and be known as Census Enumerator (government ser.).

1991 WL 671725.   The job requires Reasoning Level 3, meaning that the worker must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations."   *Ibid.*

The job description for the second job, parking lot attendant, DOT 915.473-010, is as follows:

> Parks automobiles for customers in parking lot or storage garage: Places numbered tag on windshield of automobile to be parked and hands customer similar tag to be used later in locating parked automobile. Records time and drives automobile to parking space, or points out parking space for customer's use. Patrols area to prevent thefts from parked automobiles. Collects parking fee from customer, based on charges for time automobile is parked. Takes numbered tag from customer, locates automobile, and surrenders it to customer, or directs customer to parked automobile. May service automobiles with gasoline, oil, and water. When parking automobiles in storage garage, may be designated Storage-Garage Attendant (automotive ser.). May direct customers to parking spaces.

1991 WL 687865.   This job requires Reasoning Level 2, meaning that the worker must "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."   *Ibid.*

The job description for the third job, telephone quotation clerk, DOT 237.367-046 is as follows:

> Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations.

1991 WL 672194.   This job also requires Reasoning Level 3.   *Ibid.*

The ALJ found that Ms. Mikel is limited to jobs that involve simple, one or

14

two step tasks.  The Commissioner does not argue that a person with that limitation would be able to perform jobs that require Reasoning Level 2 or 3. Rather, she argues that the VE stated that there was no conflict between her testimony and information contained in the DOT, and that the ALJ was entitled to rely on her statement because plaintiff did not point out any conflict at the hearing.

The Seventh Circuit has held that, where plaintiff fails to identify a conflict at the hearing, she must later "argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00–4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT."  *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008), citing *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006)[emphasis in original].  In the Court's view, the conflict between a *de facto* limitation to Reasoning Level 1 and a job that requires a higher Reasoning Level is, or should be, apparent to a person who is familiar with DOT job descriptions.

Defendant does not dispute that a person who is limited to simple, repetitive tasks involving one or two steps would be unable to do a job that requires Reasoning Level 2 or 3.  The Court's research has not identified a precedential Seventh Circuit case on point.   The Court recognizes the case of *Sawyer v. Colvin*, 2013 WL856509 (7th Cir. 2013).  There, relying on precedent from the Eighth Circuit, the Seventh Circuit held that a person who is limited to following simple instructions is not necessarily unable to do a job that requires Reasoning Level 3. *Sawyer* is nonprecedential and is also distinguishable.  In *Sawyer*, the plaintiff was limited to "simple tasks" without a further limitation to one to two step tasks.

15

Here, however, the ALJ's written decision in effect limited Ms. Mikel to Reasoning Level 1 in that she was explicitly limited to "simple, repetitive tasks generally involving one or two steps."

The Commissioner bears the burden at step 5 of the sequential analysis of showing that the claimant can do other work.   *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).   Citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002), the Commissioner argues that it is not error for an ALJ to accept a VE's testimony where the VE's experience and knowledge is superior to that of the authors of the DOT.   Here, the VE stated (incorrectly) that her testimony was consistent with the DOT.   In such a case, "the Commissioner's implicit suggestion that the VE had some hidden knowledge that would explain away the conflicts with the DOT is frivolous."   *Overman*, 546 F.3d at 464.   Because the ALJ's finding at step 5 was premised on flawed testimony, his decision is not supported by substantial evidence and must be remanded.   *Ibid.*

This Court also agrees that the RFC finding was not supported by substantial evidence because the ALJ erred in weighing Dr. Reyes' medical opinion.

The opinions of treating doctors are not necessarily entitled to controlling weight.   Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

20 C.F.R. §404.1527(c)(2) states, in relevant part:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide

a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).  It is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.  Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(c).  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion.  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).  While he is not required to mention every piece of evidence, the ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

ALJ Hafer gave "little weight" to Dr. Reyes' opinion because Dr. Reyes wrote

17

in his office note that he was going to fill out her disability papers "with the best of his ability depending on the claimant's responses to the questionnaire."   The ALJ felt that this remark indicated that Dr. Reyes' opinion "was not valid and was based on the claimant's subjective complaints."   (Tr. 26).   The ALJ also stated that Dr. Reyes' opinion was not supported by his treatment notes, Dr. Feinerman's examination or plaintiff's activities.   (Tr. 27).

Notwithstanding Dr. Reyes' remark, there is no indication that Dr. Reyes relied *solely* on plaintiff's subjective complaints in formulating his opinion.   Dr. Reyes specifically cited to plaintiff's MRI results as evidence supporting his opinion. And, Dr. Reyes' office notes documented findings that supported his opinion, such as positive straight leg raising (Tr. 375, 518-519), muscle spasms in the back and tenderness radiating into the thigh (Tr. 377), and neuropathy (Tr. 487).   Further, the ALJ's reliance on Dr. Feinerman's report here is puzzling.   The ALJ said that he gave "significant weight consistent with the residual functional capacity" to Dr. Feinerman's opinion.   It is unclear what the ALJ meant by this statement, but he obviously rejected Dr. Feinerman's conclusion that plaintiff had no functional limitations.   See, Tr. 26.   He also rejected the opinion of the state agency consultant as to RFC.   (Tr. 26).   The fact that Dr. Reyes' opinion conflicted with other opinions that were also rejected is of little significance.   Further, the ALJ remarked that plaintiff was not treated by a specialist and that "[t]here was no evidence that any of her conditions were of a surgical nature."   However, Dr. Reyes' office notes indicate that he would refer her to a neurosurgeon when she got on Medicaid.   (Tr. 442).   His notes also reflect that plaintiff had difficulty paying for

18

her medications and medical treatment.   See, e.g., Tr. 374, 501, 518.   The ALJ

erred in relying on lack of treatment by a specialist without considering the reason

for that lack.   *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013).   In short,

the ALJ failed to give adequate reasons for rejecting the treating doctor's opinion.

Because of the ALJ's errors, this case must be remanded.   The Court wishes

to stress that this Memorandum and Order should not be construed as an

indication that the Court believes that Ms. Mikel was disabled during the relevant

time period or that she should be awarded benefits.   On the contrary, the Court

has not formed any opinions in that regard, and leaves those issues to be

determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jeanette L. Mikel's application

for social security disability benefits is **REVERSED and REMANDED** to the

Commissioner for rehearing and reconsideration of the evidence, pursuant to

sentence <u>four</u> of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:   November 16, 2015.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**